**UNITED STATES v. BROOKRIDGE FARM, Inc.**

No. 1982.

Circuit Court of Appeals, Tenth Circuit.

April 15, 1940.

HUXMAN, Circuit Judge, and VAUGHT, District Judge, dissenting in part.

———◆———

Ivor O. Wingren, Asst. U. S. Atty., of Denver, Colo., and Maurice W. Hibschman, of Washington, D. C. (Francis M. Shea, Asst. Atty. Gen., Thomas J. Morrissey, U. S. Atty., of Denver, Colo., and Enoch E.

Ellison, of Washington, D. C., on the brief), for appellant.

William Grant, of Denver, Colo. (Morrison Shafroth, of Denver, Colo., on the brief), for appellee.

Before BRATTON and HUXMAN, Circuit Judges, and VAUGHT, District Judge.

BRATTON, Circuit Judge.

This is a suit instituted by Brookridge Farm, Incorporated, against the United States under the provisions of subdivision (20) of section 24 of the Judicial Code, 28 U.S.C.A. § 41 (20), as amended, to recover damages for alleged breach of a contract to furnish milk for consumption at Fitzsimons Hospital, located at Denver, Colorado.

Under date of March 26, 1938, the Quartermaster, Purchasing and Contract Officer, at the hospital wrote the Quartermaster General requesting authority to issue to dairies in the vicinity of Denver invitations for bids to furnish milk for the hospital throughout the fiscal year commencing July 1, 1938, and ending June 30, 1939. The authority was granted, and invitations were mailed on April 14 inviting bids to be opened on April 29. Plaintiff submitted a bid to furnish the estimated quantity of milk at a total cost of $61,830, and City Park Dairy submitted a similar bid at a total cost of $43,867. Each bid was accompanied by a surety bond conditioned for the performance of the contract. The bid of plaintiff was accepted, the contract was awarded to it, and the formal contract was executed April 30. Within a day or two thereafter, plaintiff placed an order for a large quantity of bottles and cases and began the purchase of additional cows necessary for the performance of the agreement. On May 9, the Quartermaster, Eighth Corps Area, radiogramed the Quartermaster at the hospital to suspend the award pending a decision of the Comptroller General concerning the legality thereof, and on the same day the Quartermaster at the hospital mailed a copy of the radiogram to plaintiff. Despite such notice, plaintiff continued its preparations for the performance of the contract, and by July 1 it had purchased ninety-six additional cows, a truck for the transportation of the milk, and a large number of bottles and cases, and had made enlargements and improvements of its plant necessary for the fulfillment of the contract. On June 30, plaintiff was advised that the contract had been cancelled, that no milk would be accepted, and that the truck would not be allowed to come on the premises. Plaintiff sold at a loss milk which had been bottled for delivery on July 1; during the remainder of the month it furnished milk to the hospital on a day-to-day basis at the same prices as those contained in the contract; and in August and September the hospital purchased its supply of milk from City Park Dairy. Invitations were issued early in September for the furnishing of milk from October 1, 1938, to June 30, 1939; plaintiff submitted a bid containing lower prices than those contained in its former bid; the bid was accepted and a contract was entered into; and plaintiff furnished the milk throughout the remainder of the fiscal year.

The court found that the first contract was valid; that it was wrongfully breached; that the second did not compromise, rescind, abrogate, or discharge the first as to the time common to both; that the loss of profit which plaintiff sustained during August and September amounted to $5,891.-51; and that the loss of profit from October 1, 1938, to June 30, 1939, amounted to more than $10,000. Judgment was rendered against the United States for $10,000, with interest thereon from date at four per cent per annum, D.C., 27 F.Supp. 909.

The validity of the contract is challenged. It is not contended that the Quartermaster lacked authority in law to enter into a contract of that kind. Neither is fraud or bad faith on his part charged. On the contrary, his good faith is expressly conceded. The contention is that the contract should have been awarded to the lowest bidder or all bids rejected. Section 3709, Revised Statutes, 41 U.S.C.A. § 5, is a general statute having application to all departments of the Government. It provides that except as otherwise provided by law all purchases and contracts for supplies shall be made by advertising a sufficient time previously for proposals, when the public exigencies do not require the immediate delivery of such articles; and that when immediate delivery is required by the public exigency, the articles may be procured by open purchase or contract at the places and in the manner in which they are usually bought and sold. The Act of July 5, 1884, 23 Stat. 109, as amended, 10 U.S.C.A. § 1200, relates only to the purchase of supplies for the Army. It provides that, except as otherwise provided for, and except in cases of emergency,

which must be reported at once to the Secretary of War for his approval, all purchases of regular and miscellaneous supplies shall be made by contract after public notice of not less than ten days for small amounts for immediate use, and of not less than from thirty to sixty days whenever in the opinion of the Secretary the circumstances of the case and conditions of the service shall warrant such extension of time; and that the award in every case shall be to the lowest responsible bidder for the best and most suitable article, the right being reserved to reject any and all bids. And section 219, Revised Statutes, 10 U.S. C.A. § 1192, provides, among other things, that the Secretary of War shall from time to time define and prescribe the kinds as well as the amount of supplies to be purchased by the Quartermaster Corps of the Army and the duties and powers thereof respecting such purchases. Army Regulations AR 5—160, S. 2, Part 5, Par. 5 (b) provides that a responsible bidder is "one who (a) qualifies as such under the laws and regulations governing the purchase of articles in question, (b) has complied with all of the requirements for the invitations of bids, * * * (d) is in a position to perform the contract and whose previous record for the faithful performance of similar obligations does not justify determination that he is irresponsible." And Army Regulations AR 5—169, Part 8, Par. 11 provides that the lowest bid as to price may be rejected by the purchasing officer "if (1) The bidder does not qualify as a responsible bidder * * * (3) All the essential conditions of the invitation have not been complied with." The purpose of these statutes and regulations is to give all persons equal right to compete for Government contracts; to prevent unjust favoritism, or collusion or fraud in the letting of contracts for the purchase of supplies; and thus to secure for the Government the benefits which arise from competition. In furtherance of such purpose, invitations and specifications must be such as to permit competitors to compete on a common basis. Conditions or limitations which have no reasonable relation to the actual needs of the service and which are designed to limit bidding to one of several sources of supply are interdicted, and render the award of a contract made in such circumstances voidable.

The letter of the Quartermaster at the hospital addressed to the Quartermaster General requesting authority to issue invitations to the dairies to submit bids made reference to the regulations which provided that Grade A pasteurized milk should be procured for the Army whenever available; it stated that an extensive survey disclosed that none of the dairies in the vicinity of the hospital was in position to furnish milk of that grade but that several had expressed a desire to make the necessary changes in their plants and to increase their stock of dairy cows to enable them to furnish it, provided they were able to secure the business for at least a year, and that in order to insure an uninterrupted supply of milk it would be necessary to mail bidding forms at the earliest practicable date in order to allow time to enter into contract with the successful bidder and to enable it to make the necessary changes in its dairy and pasteurized plants. Standard forms of invitations for bids were sent to the dairies. Standard forms of instructions and specifications which accompanied and were a part of the invitations provided that the award of contracts would be limited to bidders whose establishments had passed an army sanitary inspection within the calendar month preceding the opening date of the bids and were listed as approved sources of supply, and that provision was in strict conformity with existing general instructions issued by the Quartermaster General. The medical inspector at the hospital filed with the Quartermaster there a certificate dated April 29, in which he certified that he had inspected the respective plants of plaintiff, City Park Dairy, and Carlson-Frink Company, and that as the result it was considered that plaintiff was the only dairy company qualified to deliver fresh, Grade A milk. The inspector made a second certificate under date of May 16, in which he certified that in conjunction with the station veterinarian he had made inspections of the respective plants of plaintiff and City Park Dairy with a view to determining whether either or both were in position to furnish Grade A pasteurized milk; that as the result it was his opinion that on the date of the award plaintiff was a model and up-to-date dairy that met all requirements for furnishing such milk, provided a plate glass partition 32 x 12 in size be installed between the bottle washer and the bottle filler; that the estimated cost of such partition was $200, and would require less than a week of labor; that according to his understanding it was then in process of construction; that he considered the installation of such partition would in no way

enhance the quality of the milk of plaintiff and was more of a theoretical rather than a practical necessity; that City Park Dairy was old and in a bad state of repair; that it did not meet the requirements on the date of the award; and that before it could qualify to furnish Grade A milk, as defined in the requirements of the United States Public Health Service Milk Ordinance and Code, it would be necessary to construct a new dairy barn and milk house. On the same date, the attending veterinarian made a similar certificate. And on June 22, the dairy of plaintiff was approved without condition or qualification, and a regular form of that effect was filled out and transmitted through regular channels. City Park Dairy did not meet the requirements for eligibility in that it failed to pass successfully an army sanitary inspection within the calendar month preceding the date fixed for the opening of the bids; it did not then have the facilities with which to furnish the desired supply of Grade A pasteurized milk; and it failed to give assurance which was deemed satisfactory that it would provide such facilities before the beginning of the fiscal year. Plaintiff had seasonably passed the requisite inspection, and was in all substantial respects prepared to furnish the needed quantity of Grade A milk. The only requirement was the installation of a partition at the nominal cost of $200 and a week of labor, and that requirement was more theoretical than otherwise.

■ In view of the expressly conceded fact that the Quartermaster acted in good faith, that the condition contained in the instructions and specifications limiting the award of contract to bidders whose plants had within the specified time passed an army sanitary inspection was a general provision in use throughout the service, not an extraordinary provision specially prepared for use in limiting the bidding and the award of the particular contract in question to plaintiff, that it had reasonable relation to the needs of the service, that City Park Dairy failed to comply with its requirements, was not facilitated to furnish the desired quantity and quality of milk, and did not give satisfactory assurance that it would be able to do so, we cannot say that in disregarding the bid of City Park Dairy and accepting that of plaintiff, the Quartermaster exceeded the authority vested in him by the statutes and regulations to which reference has been made.

It follows that the contract became a binding obligation at the date of its execution, and its subsequent repudiation constituted a breach for which the United States incurred responsibility in damages. And the amount of the damages sustained during August and September is not in dispute.

■ We come now to the question whether the execution and performance of the second contract forecloses plaintiff from recovering damages which accrued after October 1. The question must be determined by the law of Colorado. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. The facts in McKay v. Fleming, 24 Colo. App. 380, 134 P. 159, were that the parties entered into a written contract in which plaintiff purchased from defendant certain real estate for a fixed consideration to be paid part in cash and part in notes, and made a small down payment in cash. Later, and before the time expired for the payment of the balance and the execution and delivery of the notes, defendant advised plaintiff that he would be unable to convey the property for the reason that he owned only an undivided half interest in it and his co-owner declined to convey his interest for the fixed price. After some negotiations, plaintiff entered into a separate contract with the co-owner for the acquisition of his half interest, and at the same time entered into another contract with defendant quite similar to the first except that it was for only an undivided half interest. The sale was consummated in accordance with the two separate contracts, and plaintiff then sued for damages arising out of the breach of the first. In holding that he could not recover, the court said: "The plaintiff, by making the second contract of purchase with the defendant, lost all right to rely upon the first contract either to enforce it as a contract of sale or to rely upon it in a suit for damages for a breach thereof. After the second contract was made, the defendant was put in a position so that he could not comply with the first contract without violating the second, and the sale was closed under the second before the time expired within which the defendant could comply with the first. The plaintiff's agent suggested and wrote the second contract, in which defendant acquiesced. The plaintiff says he was compelled to make the second contract in order to overcome defendant's inability and refusal to comply with the first and in order

to make certain the purchase of the entire property; but if plaintiff elected to sacrifice his rights under the first contract, in order to make certain his purchase of the property, he ought not thereafter to complain. He was not compelled to do this, except in the sense that he was compelled to choose this horn of the dilemma. This was not duress under the law, nor would it enable plaintiff to avoid the effect of the second contract." The conclusion there reached finds support in other cases, including one from this court. United States ex rel. International Contracting Co. v. Lamont, 155 U.S. 303, 15 S.Ct. 97, 39 L.Ed. 160; Housekeeper Pub. Co. v. Swift, 8 Cir., 97 F. 290; Wiley v. Dixie Oil Co., 10 Cir., 43 F.2d 51; Arizona-Parral Mining Co. v. Forbes, 16 Ariz. 395, 146 P. 504.

■ The two contracts between these parties related to the same subject matter. Each was complete within itself. The later one completely covered the subject matter for the period of nine months common to both, and its terms were inconsistent with the former in respect to prices to be paid for the milk. The two could not stand together. Performance of both was impossible. Even though it did not contain a provision to that effect, the latter superseded and rescinded the former; rights acquired under the former were abandoned and relinquished; and liability for damages for its breach was discharged. McKay v. Fleming, supra.

■ It is urged, however, that one injured by breach of contract is in duty bound to take reasonable steps to mitigate the damages, and that the execution of the second contract was a reasonable effort in that behalf. The general rule is that one who suffers injury as the result of a tort or a breach of contract is required to exercise reasonable care and diligence to avoid the loss, or to minimize the resulting damage. And it has been held that where one obligated by contract to purchase a quantity of corn breaches the contract by refusing to accept the corn when tendered, its subsequent sale to him by separate contract at the best price obtainable does not constitute a waiver of the right to recover damages for such breach. Arkansas & Texas Grain Co. v. Young & Fresch Grain Co., 79 Ark. 603, 96 S.W. 142, 116 Am.St. Rep. 99. But in the absence of any suggestion or indication by the Supreme Court of Colorado that where perishable property is involved such an exception should be

engrafted upon the general doctrine enunciated in McKay v. Fleming, supra, we feel constrained to follow that case.

■ Ordinarily an appellate court cannot direct the entry of judgment for the correct amount. Slocum v. New York Life Ins. Co., 228 U.S. 364, 33 S.Ct. 523, 57 L.Ed. 879, Ann.Cas.1914D, 1029. It is unnecessary to explore the question whether that rule applies in a case of this kind. A remittitur may be ordered. United States Potash Co. v. McNutt, 10 Cir., 70 F.2d 126; United States v. Utah-Idaho Sugar Co., 10 Cir., 96 F.2d 756, certiorari denied 305 U.S. 631, 59 S.Ct. 95, 83 L.Ed. 404.

The judgment will be reversed and the cause remanded, unless a remittitur reducing the judgment to $5,891.51, with interest thereon at the rate of four per cent per annum from the date of such judgment, is filed in the office of the clerk of the trial court within twenty days from the date on which this opinion is filed, and within ten days thereafter a certified copy of the record showing such remittitur is filed with the clerk of this court; but if such remittitur is filed and a copy furnished within such respective times, the judgment in the reduced amount will be affirmed.

HUXMAN, Circuit Judge (dissenting in part).

■ I concur in the opinion of Judge BRATTON upholding the validity of the first contract executed between the government and Brookridge Farm, Inc., a corporation, herein called Brookridge, but dissent from that part of the opinion denying Brookridge damages for the breach of the first contract for the period of time covered by the second contract.

When the government breached its contract for the purchase of this milk, it became the duty of Brookridge to mitigate its damages by disposing of the milk on the most favorable terms obtainable. It was its duty to seek a market for the milk and realize therefrom what it could. The resultant damage is what it could charge the government with.

I do not interpret the decision of the courts of Colorado to require a holding that Brookridge could not mitigate its damage by executing a second contract with the government for its milk requirements covering the remaining period of time specified in the first contract without losing its right to proceed against the government for

damages for the breach of the first contract. The majority opinion relies largely on the case of McKay v. Fleming, 24 Colo.App. 380, 134 P. 159, to sustain its position. In my opinion, the McKay case requires no such holding.

An enunciated abstract principle of law, standing by itself and disassociated from a given state of facts, is valueless and of no effect. It is only as it relates to a given state of facts that it is effective and has life and meaning. And when the substantive ultimate facts change, the abstract principle is no longer applicable. In endeavoring, therefore, to determine if the pronouncement of a court in a given case is controlling in a question under consideration, we must first carefully ascertain whether the substantive facts in the two cases are the same.

The facts in the McKay case, supra, are essentially different from the facts under consideration here. There plaintiff purchased a specified piece of real estate from defendant at a stated consideration. It developed that defendant was the owner of only a one-half interest in the real estate and could not fulfill his contract. In order to obtain the real estate, plaintiff executed a new contract with the person with whom he had made the first contract, agreeing to purchase his undivided one-half interest in the real estate at the stipulated price in the original contract, and then made a new contract with the owner of the other half, agreeing to pay him an increased price. Then plaintiff filed his action, seeking to recover damages from the party in the original contract for breach thereof. The court rightfully held that this he could not do. There, when the contract was breached, no obligation rested upon plaintiff to do anything. He was not required to nor could he mitigate the damages in any way. His damage was the difference between the contract price and the fair, reasonable, actual value of the real estate. He had the right to sue to recover this damage, but he chose instead to enter into further negotiations for the purchase of the real estate at an increased price. In discussing the rights of the aggrieved party, the court said that when plaintiff found the defendant unable, and therefore unwilling, to perform the contract, he could have rested upon his rights under the first contract and could have brought suit for damages for its breach, but that he could not do what he did do and still rely upon his

right to a suit for damages under the first contract. The court states that "a party cannot avail himself of the nonperformance of a contract if his own act has prevented performance. His act estops him."

But here, when the government breached its contract, Brookridge could not have rested upon its rights. It was under a positive duty to take certain, affirmative steps before it could seek recovery of damages from the government. It was its duty to mitigate its damage by selling the milk at the best price obtainable. It therefore was required to make a new contract for the sale of the milk, if possible. If it made a new contract with a third party by which the government's damages were reduced, it thereby made impossible the performance of the first contract. If it now sues, can the government assert the defense in the McKay case and say that by its execution of the second contract Brookridge has made impossible the performance of the first contract and therefore is estopped?

Let us assume that, the duty resting on Brookridge to mitigate its damages, it advertises a public letting for the sale of this milk and that at this letting the government is one of two bidders and is the high bidder. Must Brookridge reject the government's higher bid and accept the lower bid, or could it do so, and then sue the government for the resulting increased damage? Or, let us assume that at this letting the government is the only bidder and that it bids a price lower than the contract price, but above the cost of production. Could Brookridge then refuse to enter a new contract with the government and sue for the contract price as its damage? It appears to me the answer must be that it could not, for the duty rests upon it to mitigate its damage to the greatest extent possible.

If what has been said is sound, then would the fact that Brookridge submitted a bid at the second public letting advertised by the government, destroy its right to recover damages for the breach of the first contract? An advertisement for a public letting for the purchase of a commodity is simply an offer to all to execute a contract for the purchase of the articles desired. It would be immaterial whether the government, after its breach of the first contract, went directly to Brookridge and offered to execute a second contract resulting in a reduction of its loss, or whether it offered to do so by notice of a public letting.

In every case coming to my attention in which the principle of mitigating damages has been present, the courts have held, without exception, that it was the duty of the aggrieved party to mitigate his damage, even to the extent of executing a new contract with the offending party, covering the same subject matter. In Warren v. Stoddart, 105 U.S. 224, 26 L.Ed. 1117, defendant had contracted with plaintiff to solicit orders for books to be furnished by defendant to plaintiff on thirty days' credit. as plaintiff contended. A large number of orders were procured. Plaintiff then quit the employ of defendant and defendant refused to furnish these books except for cash. Plaintiff procured substitute books and sought to recover his damages therefor. The Supreme Court held that even assuming that defendant had contracted to give plaintiff thirty days' credit, yet it was the duty of plaintiff to minimize his damage and where he could have procured the books from defendant by paying cash, his amount of recovery would be limited to the interest thereon. The court therefore impliedly held that it was the duty of plaintiff to minimize his damage even if by so doing he had to make a new contract with defendant for the same subject matter.

In Lawrence et al. v. Porter et al., 6 Cir., 63 F. 62, 66, 26 L.R.A. 167, the court held that on a contract for sale of goods on credit, where the seller refused to deliver them but offered to deliver for cash at a reduced price, and the reduction more than equalized the interest for the term of credit, the buyer, not alleging inability to pay cash but that he was unable to obtain the goods from others than the seller at the place of delivery, cannot recover damages on the ground that he had bought elsewhere at an advance over the contract price and cost of transportation. In the opinion, the court said: "The fact that they could only buy from the defendant does not affect the duty of plaintiffs to minimize their loss as far as they reasonably could."

The case of Arkansas & Texas Grain Co. v. Young & Fresch Grain Co., 79 Ark. 603, 96 S.W. 142, 143, 116 Am.St.Rep. 99, is very much like the case under consideration. There Young and Fresch Grain Company had sold a carload of corn to the Arkansas & Texas Grain Company. When the corn arrived, purchaser refused to accept until accorded the right to inspect. After inspection, the purchaser refused to take the corn. Young and Fresch Grain Company then sent its agent to purchaser and made a new contract with it, by which it agreed to purchase the corn at a reduced price. An action was then filed by Young and Fresch Grain Company against the Arkansas & Texas Grain Company, who had broken the first contract. Concerning the identical question under consideration here, the Supreme Court of Arkansas said: "Neither did the fact that the agent of appellee came down to Texarkana and resold the corn to defendant amount in itself to a waiver of that right. It was his duty to obtain the best price possible, and, if the best offer came from defendant, plaintiff did right in accepting the offer. The circumstances and proof justified the circuit court in finding that there was no waiver by plaintiff of the original contract, nor of its right to seek damages for breach of the contract."

It appears to me that these cases declare the correct rule. Clearly, the circumstances under which the second contract was executed do not indicate that it was the intention of Brookridge to waive its right to damages for the breach of the first contract. Brookridge had filed suit to recover damages for the breach of the first contract prior to the execution of the second contract. The second contract contained no reference to the pending suit, its dismissal or settlement. All the surrounding circumstances indicate that there was no waiver by Brookridge of its original contract nor its right to seek damages for the breach thereof.

I think the judgment of the trial court should be affirmed.

VAUGHT, District Judge (dissenting in part).

I concur in the opinion of Judge BRATTON in holding that the second contract entered into with Brookridge Farm, Inc., destroyed the right of Brookridge Farm to recover damages for a breach of the first contract.

I dissent, however, from the opinion by Judge BRATTON upholding the validity of the first contract.

The provisions of R.S. Sec. 3709, 41 U. S.C. Sec. 5, 41 U.S.C.A § 5, and 10 U.S.C. Sec. 1200, 10 U.S.C.A. § 1200, provide the authority for the War Department in letting this contract.

Section 5, supra, provides that these contracts "shall be made by advertising a sufficient time previously for proposals respecting the same, when the public exigencies do not require the immediate delivery of the articles, or performance of the service."

It will not be contended seriously that there was in this case any such exigencies as contemplated by the statute for a departure from the general rule of letting the contract.

Section 1200, supra, provides that purchases of quartermaster supplies for the Army "for immediate use shall be made by the officers of such corps branch, under the direction of the Secretary of War * * *: Provided, That all purchases of said supplies, * * * except in cases of emergency, which must be at once reported to the Secretary of War for his approval, shall be made by *contract after public notice* of not less than ten days for small amounts for immediate use, and of not less than *from thirty to sixty days* whenever, in the opinion of the Secretary of War, the circumstances of the case and conditions of the service shall warrant such extension of time. The award in every case shall be made to the lowest responsible bidder for the best and most suitable article, the right being reserved to reject any and all bids." (Italics supplied.)

In Major Wharton's request for authority from the Quartermaster General to ask for bids, he said:

"The procurement of Grade A milk, even at a slightly higher cost than milk now furnished, would be of inestimable value to this hospital. *As a result of the increased competition possible through the issuance of invitation for bids, prices received would, no doubt, compare favorably with the price now paid for the lower quality milk.* * * *" (Italics supplied.)

" * * * In order to assure an uninterrupted supply, it would be necessary to mail bidding forms at the earliest practicable date in order to allow time to enter into contract with successful bidders and enable them to make necessary changes in their dairies and pasteurizing plants."

It is clearly apparent from this letter to the Quartermaster General that there was a definite representation made to him that perhaps none of the dairies were in a position to comply with the government requirements but that a sufficient length of time should be provided to "enable them to make necessary changes in their dairies and pasteurizing plants."

Prior to the letting of the contract on April 29, 1938 an inspection had been made and it had been determined that although none of the dairies could technically comply with the requirements, the Brookridge Farm bid was the only bid that could be considered. Notwithstanding this fact, City Park Dairy filed its bid for $43,867 and also furnished a bid bond in the amount of $10,000 conditioned that it would enter into the contract and give a performance bond. Brookridge Farm submitted a bid of $61,830 and furnished a bid bond in the amount of $6,500. Here is a difference of approximately $18,000 which would represent a saving of more than twenty-nine per centum of the bid of Brookridge Farm. Certainly there was no competition if the Brookridge Farm bid was the only bid to be considered and, furthermore, there was an absolute disregard of the very provisions and conditions under which the bids were called for when the bid of City Park Dairy was placed in the discard although it had furnished a bond of $10,000 that it would meet the requirements of the government.

The invitations were mailed on April 14 for bids to be opened on April 29. The bid of Brookridge Farm was very promptly accepted and the contract was awarded on April 30. As stated in Judge BRATTON's opinion, "within a day or two thereafter, plaintiff placed an order for a large quantity of bottles and cases and began the purchase of additional cows necessary for the performance of the agreement. On May 9, the Quartermaster, Eighth Corps Area, radiogramed the Quartermaster at the hospital to suspend the award pending a decision of the Comptroller General concerning the legality thereof, and on the same day the Quartermaster at the hospital mailed a copy of the radiogram to plaintiff. Despite such notice, plaintiff continued its preparations for the performance of the contract, and by July 1 it had purchased ninety-six additional cows, a truck for the transportation of the milk, and a large number of bottles and cases, and had made enlargements and improvements of its plant necessary for the fulfillment of the

contract. On June 30, plaintiff was advised that the contract had been cancelled."

Notwithstanding the foregoing facts, Brookridge Farm made no effort to cancel the orders which it had placed and there is nothing in the record to indicate that all these orders could not have been cancelled without any loss whatever to it.

This contract to furnish the milk was not to become effective until July 1. A few weeks after that time, even under the conditions that existed, City Park Dairy was in a position to furnish the milk, and did furnish the milk through September and October. Why the haste to secure this contract for Brookridge Farm? Why, with such a difference in the amount of the bids, was not a reasonable time given to City Park Dairy to make the necessary improvements?

The whole trend of our courts for at least a half century has been to discourage the departure from strict statutory provisions in awarding government contracts.

The awarding of such contracts in many instances has been followed by scandals and circumstances questioning the integrity of the awarding officers. It was for this reason that the statute was made explicit and a distinction was made between emergency awards and awards in due course. Questions of this character concern the interest of not only the federal government but of every taxpayer in the nation.

Brookridge Farm is charged with a knowledge of this law and its provisions. It knew as well as the awarding officer that there was no competition and, doubtless, the high bid of Brookridge Farm was due to the one fact that it knew that its bid would be the only bid considered, therefore, it could dictate its price.

Another circumstance, which convinces me that the high bid of Brookridge Farm was due to the fact that it knew its bid was the only bid that would be considered, was that in October it made a new bid in competition with City Park Dairy at a price even lower than that made by City Park Dairy in April.

I cannot escape the conclusion that there was no competition, that an undue advantage was taken by Brookridge, that it placed its high bid with the full knowledge and understanding that its bid would be the only bid considered, and, therefore, it could dictate the exorbitant price which it submitted, and, that since there was only one bid the Department should have refused an award and readvertised.

I cannot bring myself to the opinion that this court should lend its power to the enforcement of so questionable a contract.

The case should be reversed.