USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-1592

 JIM DYKES,

 Plaintiff, Appellant,

 v.

 DEPUY, INC.,

 Defendant, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Robert E. Keeton, U.S. District Judge]

 Before

 Stahl Circuit Judge,
 
 Campbell and Bownes, Senior Circuit Judges.
 

 

 David C. Casey, with whom Michael G. Donovan and Peckham,
Lobel, Casey, Prince & Tye were on brief, for appellant.
 Donald E. Knebel, with whom Dwight D. Lueck and Barnes &
Thornburg were on brief, for appellee.

April 3, 1998

 
 
 CAMPBELL, Senior Circuit Judge. This appeal arises from
the district court's grant of summary judgment in favor of
defendant-appellee DePuy, Inc. ("DePuy") on six counts of an
eleven-count amended complaint brought against DePuy by plaintiff-
appellant Jim Dykes. In 1994, DePuy terminated Dykes and his firm
from continuing to act as its New England sales representative. 
Dykes had, by then, represented DePuy in one or another capacity
for over sixteen years. When terminated, Dykes was still four
years away from possible qualification under DePuy's "Compensation
Upon Termination" program, which would have allowed him to claim a
substantial annual income for ten years. He sued DePuy alleging
federal claims under ERISA and the ADA, and state claims, including
bad faith termination. In awarding summary judgment to DePuy, the
district court concluded, inter alia, that Dykes was an independent
contractor, hence barred from suing under ERISA and the ADA. The
court further rejected his state-law claims for bad faith
termination. The court also refused to allow Dykes to engage in
further discovery. We affirm.
 I. BACKGROUND
 Because this case comes to us after a grant of summary
judgment, we state the facts in the light most favorable to the
nonmoving party, indulging all inferences in that party's favor. 
See Ortiz-Pinero v. Rivera-Arroyo, 84 F.3d 7, 11 (1st Cir. 1996).
 DePuy is an Indiana-based company that manufactures
orthopedic products. During the time period relevant to this
action, DePuy marketed its products via a network of "sales
representatives," each of which was responsible for sales within an
assigned territory. Sales representatives, in turn, hired "sales
associates" to help them conduct business.
 In 1977, Dykes was hired as a sales associate by DePuy-
Morse, a sales representative of DePuy located in South Easton,
Massachusetts. Dykes held that position until 1981, when he was
hired as a sales associate by Ron Wood of Wood-Yates, a sales
representative of DePuy located in Cheshire, Connecticut. Dykes
performed extremely well as a sales associate; he was named Sales
Associate of the Year in 1986.
 In 1988, when Dykes learned that Ron Wood planned on
retiring, Dykes formed Health Systems, Inc. ("Health Systems"). On
July 1, 1988, Health Systems, Dykes, and DePuy entered into a Sales
Representative Agreement ("SRA"). According to the SRA, Health
Systems was the "Representative," defined as the "exclusive Sales
Representative for all products sold by DePuy," and Dykes was the
"Principal," meaning that he was the "owner of all or substantially
all of the outstanding shares of Representative."
 The SRA not only set out the terms under which the
parties would conduct business but also undertook to define the
legal relationship between the parties. Thus, it expressly
declared that the Representative was an independent contractor and
that the persons hired by the Representative were not employees or
independent contractors of DePuy itself. The SRA gave the
Representative discretion regarding the time and manner of making
sales calls and the responsibility for paying taxes, unemployment
compensation, workers' compensation, and insurance premiums. The
SRA lasted for one year and renewed automatically "unless
terminated by either party giving at least 90 days' notice prior to
the end of the initial period or any renewal period." The SRA did
not require "good cause" termination or place any other limitation
on the parties' ability to sever their relationship.
 Pursuant to the SRA, DePuy offered a "Compensation Upon
Termination" program to its sales representatives. Under this
program, Dykes would receive substantial compensation on an annual
basis for a period of ten years after the termination of the SRA
if, and only if, he satisfied certain conditions precedent. In
order to qualify, Dykes had to work at least fifteen years as a
sales representative, or a combination of twenty years as a sales
representative and sales associate, with at least ten years as a
sales representative. In addition, Dykes had to sell a certain
volume of DePuy's products in the year before the termination of
the SRA. The SRA expressly provided that the Compensation Upon
Termination program,
 shall not restrict the right of DePuy to
 terminate Representative or restrict the right
 of Representative to terminate its
 relationship with DePuy. If that relationship
 is terminated before Representative and
 Principal have met the conditions
 precedent . . . , Representative and Principal
 will have no rights under this Agreement.

According to Dykes, DePuy frequently promoted the Compensation Upon
Termination program to maintain the sales representatives' loyalty
and to ensure their longevity with the company.
 As a DePuy sales representative, Health Systems was
responsible for selling DePuy's products in "DePuy New England," a
territory defined by DePuy that included Maine, Vermont, most of
New Hampshire, Connecticut, and portions of Massachusetts. As the
Principal of Health Systems, Dykes had a great deal of autonomy. 
For example, he himself decided how much compensation he would
receive. DePuy never asked Dykes how many hours he worked and
Dykes could take a vacation without notifying DePuy. Dykes could
not recall sending DePuy any information on Health Systems's
expenses or profits. DePuy provided an educational allowance to
enable representatives to conduct seminars in their territory and
a "bonus commission program" designed to help representatives buy
medical instruments and hire sales associates, but Dykes could
choose whether to avail himself of these benefits.
 Dykes also controlled the day-to-day operation of Health
Systems. He hired and established salaries for his office staff
without consulting DePuy. He hired and paid his wife to assist him
with Health Systems's business. Dykes fired at least one sales
associate without DePuy's prior knowledge. Commissions on the
sales made by Dykes's sales associates were paid by DePuy at first
to Dykes, and then to Health Systems. DePuy reported this income
on Form 1099s, not W-2s, and did not withhold taxes. In turn,
Dykes paid his each of his sales associates a commission agreed
upon between Dykes and the individual associate. Dykes also did
not withhold taxes from the commission checks, opting rather to
send Form 1099s to the sales associates at the end of the year. 
Dykes does not recall sending DePuy any information on how much he
paid his sales associates. 
 Under the terms of the SRA, Health Systems was
responsible for providing health insurance for Dykes, the sales
associates and office staff. DePuy recommended a particular health
insurance provider and urged its sales representatives to use that
provider. Health Systems used that provider for a while, but later
switched carriers to obtain a cheaper premium rate. DePuy raised
no objection to the change. 
 Health Systems was solely responsible for its business
accommodations. It paid rent on and maintained its own office
space. It also paid for its office furniture and supplies.
 Despite the fact that Dykes was, in many ways, running
his own business, DePuy maintained some control over Health
Systems. A clause in the SRA required Dykes to devote all of his
professional efforts toward promoting only DePuy's products unless
he obtained express written consent from DePuy. The SRA also
stated that "Representative and Principal shall be guided by the
DePuy Sales Policy Manual and other DePuy policies that are made
known to Representative." DePuy generated marketing materials that
Representatives were required to use. DePuy's Sales Advisory
Committee produced directives containing advice on how to sell
DePuy's products that it distributed to sales representatives. In
addition, all customer billing was processed through DePuy's
headquarters in Indiana.
 Dykes and Health Systems were successful at selling
DePuy's products. From July 1988 through December 1993, sales in
DePuy New England grew over twenty-six percent, eight percent above
DePuy's national average, and the territory's market share rose
from two percent to five-and-a-half percent. In 1991, Dykes
received additional territory from DePuy and entered into a new
SRA, which contained similar terms to the 1988 agreement.
 Despite this success, DePuy timely notified Dykes that
his SRA would terminate on April 1, 1994. At the time of
termination, Dykes had sold DePuy's products for over sixteen years
and was four years away from qualifying for the Compensation Upon
Termination program. Dykes alleges that DePuy terminated his SRA
in order to prevent him from collecting his benefits. To support
this assertion, Dykes introduced affidavits from several former
sales representatives, including one who stated that DePuy's CEO
had declared that "DePuy's sales representatives did not deserve
their retirement compensation and that he would see that they did
not get it." Dykes has discovered that at least twenty-nine out
of forty-four sales representatives were terminated prior to
vesting. 
 After DePuy terminated its SRA with Dykes and Health
Systems, Dykes became a sales associate on a month-to-month basis. 
During his first month under this new arrangement, Dykes was
diagnosed with cancer and underwent related surgery. On May 12,
Dykes informed DePuy that he would begin chemotherapy soon. Five
days later, DePuy terminated Dykes as a month-to-month sales
associate. Later in 1994, DePuy began replacing its regional sales
representatives with "Territory Managers," who DePuy admits are
employees.
 On January 12, 1995, Dykes filed a complaint against
DePuy in the United States District Court for the District of
Massachusetts. When amended, his complaint alleged eleven counts,
including violations of the Employee Retirement Income Security Act
("ERISA"), 29 U.S.C. 1001 et seq., the Americans with
Disabilities Act ("ADA"), 42 U.S.C. 12101 et seq., and various
state-law claims.
 On May 7, 1996, Dykes filed a motion to compel 
discovery, including of information regarding whether other sales
representatives had successfully claimed their Compensation Upon
Termination. After a hearing, the magistrate judge granted Dykes's
motion in part, but denied Dykes's request for information on
DePuy's sales representatives.
 On August 21, 1996, DePuy moved for summary judgment on
all of Dykes's claims. Discovery closed roughly three months
later, on November 30, 1996. A little more than a week after that,
Dykes filed a motion for reconsideration of the magistrate judge's
partial denial of his motion to compel. Dykes had not sought any
extension to the discovery deadline, but blames his delay on
inaccuracies in the information produced by DePuy. On December 13,
Dykes filed his opposition to DePuy's motion for summary judgment.
 After a hearing, the district court issued a memorandum
and order granting DePuy's motion for summary judgment on all
Dykes's federal counts and some of his state counts. The court
dismissed without prejudice the remaining state-law claims.
 On March 10, 1997, Dykes filed a motion seeking to delay
the entry of final judgment until after the resolution of his
motion for partial reconsideration. The next day, the magistrate
judge denied Dykes's motion for partial reconsideration of his
earlier discovery order. Three days later, the district court
denied Dykes's motions for reconsideration of its grant of summary
judgment and affirmed the magistrate judge's denial of his motion
to compel. After final judgment issued, Dykes took this appeal.
 II. STANDARD OF REVIEW
 The granting of summary judgment is reviewed de novo, the
entire record being seen "in the light most hospitable to the party
opposing summary judgment, indulging all reasonable inferences in
that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st
Cir. 1990) (citations omitted). Summary judgment is appropriate
only if "the pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law." Fed.
R. Civ. P. 56(c).
 Summary judgment may properly be awarded against a party
who, "after adequate time for discovery . . . fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear
the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S.
317, 322 (1986). And summary judgment is not precluded by just any
factual quibble: "The evidence manifesting the dispute must be
'substantial,' going beyond the allegations of the complaint." 
Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975) (citations
omitted). To prevail over a properly supported motion for summary
judgment, a nonmoving party must establish the existence of a
trial-worthy issue by presenting "enough competent evidence to
enable a finding favorable to the nonmoving party." Goldman v.
First Nat'l Bank, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).
 We review the district court's denial of Dykes's motion
to compel discovery and motion for partial reconsideration under an
abuse of discretion standard. See Ayala-Gerena v. Bristol Myers-
Squibb Co., 95 F.3d 86, 91 (1st Cir. 1996).
 III. DISCUSSION
 Dykes raises three issues on appeal. First, whether the
district court properly determined that he had failed to raise a
genuine issue of material fact regarding whether he was an employee
rather than an independent contractor. Second, whether the
district court correctly granted summary judgment on his state-law
claims alleging breach of the implied covenant of good faith and
fair dealing. Third, whether the court below abused its discretion
by denying his request for reconsideration of the magistrate
judge's discovery ruling.
A. Dykes's Employment Status.
 Three of Dykes's contentions stand or fall on whether he
was an employee rather than an independent contractor. Both ERISA
(Count II) and the Massachusetts Antidiscrimination Statute, Mass.
Gen. Laws Ann. ch. 151B (Count X), protect employees, but neither
extends to independent contractors. See Nationwide Mut. Ins. Co.v. Darden, 503 U.S. 318, 320-21 (1992) (ERISA does not reach
independent contractors); Speen v. Crown Clothing Corp., 102 F.3d
625, 628-29 (1st Cir. 1996) (Massachusetts Antidiscrimination
Statute covers only employees, not independent contractors); Comeyv. Hill, 438 N.E.2d 811, 814 (Mass. 1982) (same). The parties
agree that the ADA (Count XI) also applies only to employees. 
Accordingly, in order to avoid DePuy's motion for summary judgment
on these statutory claims, Dykes must produce evidence sufficient
to allow a reasonable factfinder to conclude that he was a DePuy
employee. See Anderson, 477 U.S. at 248-49.
 To determine whether a plaintiff qualifies as a protected
employee under ERISA or the Massachusetts Antidiscrimination
Statute, this court will ordinarily utilize the traditional common
law test of agency. See Speen 102 F.3d at 632. The test provides
"no shorthand formula or magic phrase that can be applied to find
the answer, . . . all of the incidents of the relationship must be
assessed and weighed with no one factor being decisive." Darden,
503 U.S. at 324 (quoting NLRB v. United Ins. Co. of Am., 390 U.S.
254, 258 (1968)). The lower courts should consider:
 the hiring party's right to control the manner
 and means by which the product is
 accomplished. Among the other factors
 relevant to this inquiry are the skill
 required; the source of the instrumentalities
 and tools; the location of the work; the
 duration of the relationship between the
 parties; whether the hiring party has the
 right to assign additional projects to the
 hired party; the extent of the hired party's
 discretion over when and how long to work; the
 method of payment; the hired party's role in
 hiring and paying assistants; whether the work
 is part of the regular business of the hiring
 party; whether the hiring party is in
 business; the provision of employee benefits;
 and the tax treatment of the hired party.

Id. at 323-24 (quoting Community for Creative Non-Violence v. Reid,
490 U.S. 730, 751-52 (1989)).
 We shall employ the same common law agency test in
assessing Dykes's status for purposes of his ADA claim. A major
reason given by the Supreme Court for its adoption of the common
law test in the ERISA context was ERISA's "completely circular"
definition of the term "employee." Id. at 323. That definition of
"employee" "any individual employed by any employer," 29 U.S.C. 
1002(6) is virtually the same as the ADA's definition "an
individual employed by an employer," 42 U.S.C. 12111(4). Hence
the same common law agency standards seem appropriate for deciding
whether Dykes was an employee for ADA purposes. See also Birchem,
116 F.3d at 312 (applying the common law test to an ADA claim).
 Turning to the present case, the facts relevant to
Dykes's claim to be DePuy's employee are much the same as those
that we considered in Speen. In that case, applying the common law
test of agency, this court held that Speen, a traveling salesman,
had failed to raise a triable issue regarding his asserted employee
status. See Speen, 102 F.3d at 632-34. Finding Speen to be an
independent contractor, we affirmed judgment as a matter of law for
the defendant on Speen's ADEA, ERISA, and state discrimination
claims. See id. at 634.
 Like Speen, Dykes enjoyed broad control over his day-to-
day business: he set his own hours, paid his own salary, and
decided where and when to make sales calls. Neither salesman had
to report regularly to a corporate headquarters. Both Dykes and
Speen sold the same brand of product for over fifteen years. Both
conducted business through their own corporate entities and both
were paid on a commission basis. Both received Form 1099s rather
than W-2s for federal tax purposes.
 Further, because Dykes ran his own business, he enjoyed
greater freedom than Speen in several important ways. The evidence
demonstrates that Dykes controlled the employment and salaries of
his office staff and sales associates. Dykes and Health Systems
rented and maintained office space and acquired office furniture. 
Also, whereas Speen was required to phone his sales numbers in to
the home office daily, DePuy had no knowledge of Dykes's expenses
and profits. Moreover, unlike Speen, Dykes had a signed written
contract that clearly stated that he was an independent contractor,
and that "[a]ll personnel of Representative [Health Systems] shall
be employees, or independent contractors of Representative, and not
of DePuy."
 Dykes tries to escape from under the shadow of Speen by
arguing that DePuy maintained more control over his business than
Crown Clothing did over Speen's. Dykes does not persuade us. 
Several of the arguments that Dykes makes to distinguish Speen are
not supported by the record. Some of his other arguments cut in
both directions. For example, Dykes argues that internal memoranda
and marketing directives produced by DePuy limited his business
discretion greatly. Dykes supports this argument by claiming that
DePuy required him to hire a medical specialist if he wanted to
sell spine products. This piece of evidence cuts both ways, as it
demonstrates that Dykes had discretion over which products he
wished to sell. See Johnson v. Equitable Life Assurance Soc'y of
the United States, 1997 WL 417409, at *3 (N.D. Ill. July 22, 1997)
(finding that discretion over which products to sell points toward
independent contractor status).
 Dykes insists that the Compensation Upon Termination
program was a retirement program used by DePuy to control its sales
representatives to such a degree that they effectively became
employees of DePuy. The program, however, depended on several
contingencies prior to vesting, and while it undoubtedly provided
a strong incentive for sales representatives to want to maintain
their contractual relationship with DePuy, it does not overcome the
many indicia that that relationship was one of independent
contract, not employment. 
 We conclude that a reasonable factfinder could not find
on this record that DePuy was Dykes's employer. Dykes has pointed
to no case law in which a court has held, on similar facts, that an
employer-employee relationship existed. Under the multi-factored
common law test of agency, and in light of Speen, Dykes has failed
to raise genuine factual issues regarding his employment status. 
Since as a matter of law Dykes was an independent contractor, the
district court properly granted summary judgment on Dykes's ERISA,
ADA, and state antidiscrimination claims.
B. Dykes's Allegations Regarding Breach of the Implied
 Covenant of Good Faith and Fair Dealing.
 Dykes alleges that DePuy improperly terminated his
relationship in bad faith in order to avoid paying him his
Compensation Upon Termination (Count I). When facing a claim that
does not arise under the Constitution or the laws of the United
States, a federal court must apply the substantive law of the forum
in which it sits, including that state's conflict-of-laws
provisions. See Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487,
496 (1941). This principal applies with equal force to a state-law
claim brought under supplemental jurisdiction, such as this. 
See Bi-Rite Enters., Inc. v. Bruce Miner Co., 757 F.2d 440, 442
(1st Cir. 1985) (citing United Mine Workers v. Gibbs, 383 U.S. 715,
726 (1966)). Thus, we must determine what law a Massachusetts
court would apply.
 If two contracting parties express "a specific intent as
to the governing law, Massachusetts courts will uphold the parties'
choice as long as the result is not contrary to public policy and
as long as the designated State has some substantial relation to
the contract." See Steranko v. Inforex, Inc., 362 N.E.2d 222, 228
(Mass. App. Ct. 1977) (citations omitted). The SRA signed by Dykes
and DePuy states that it is "governed by and interpreted in
accordance with the laws of the State of Indiana." Neither of the
parties here argues that application of Indiana law would
contravene public policy. Since DePuy is headquartered in Indiana,
that state bears a "substantial relation to the contract." Id. 
Accordingly, if Dykes's claims for breach of good faith and fair
dealing arise from the SRA, we will apply Indiana law.
 Dykes seeks to avoid this result by arguing that Count I
of his complaint somehow presents a cause of action for wrongful
discharge distinct from Dykes's contract and that therefore Count
I should be evaluated under the substantive law of Massachusetts. 
We believe that Dykes's claim can properly be understood only as a
claim for breach of an implied term of the SRA, the contract
governing his relationship with DePuy. For that reason, it is
governed by Indiana law.
 In order to support his contention that his "wrongful
termination" rests solely on Massachusetts's law, Dykes relies on
a line of Massachusetts cases that have held that an employee at-
will who is fired without good cause may recover amounts wrongfully
withheld by an employer. See Fortune v. National Cash Register
Co., 364 N.E.2d 1251, 1255-56 (Mass. 1977). It is true that
Dykes's arrangement was "at-will," in that under the SRA either
party could withdraw upon giving ninety days' notice. However,
Fortune, the case that created this exception to the general
presumption that an at-will employee may be fired for any reason or
no reason at all, states expressly that "termination by the
employer of a contract of employment at will which is motivated by
bad faith or malice . . . constitutes a breach of the employment
contract." Id. This language belies any notion of a cause
separable from the employment contract; rather the Massachusetts
Supreme Judicial Court appears to have infused Massachusetts
express or implied at-will employment contracts with an implied
term that they be executed in good faith. If there is a
Massachusetts legal requirement that cabined DePuy's ability to
terminate its arrangement with Dykes it would arise as a covenant
implied within the SRA itself. Dykes alleges that the bad faith
reason for terminating him was DePuy's desire to avoid paying Dykes
any money under the Compensation Upon Termination program. Since
the program was created by the SRA, any rights that Dykes might
have are inextricably bound up with that agreement. We conclude
that a Massachusetts court, following the SRA's choice of law
provision, would look to Indiana substantive law to evaluate Count
I of Dykes's complaint.
 Further, the parties agree that Dykes's two separate
allegations of breach of the duty of good faith and fair dealing,
Counts III and VIII, both arise under the SRA. In light of our
discussion above, then, we apply Indiana law for the purposes of
determining Dykes's rights relative to those claims as well.
 The SRA allows either party to terminate the agreement
for any reason or no reason, provided only that the terminating
party give ninety days' notice. Dykes does not argue that DePuy
provided insufficient notice. DePuy, therefore, was within at
least its express contractual rights in terminating its arrangement
with Dykes.
 As noted, courts in some states limit employers'
discretion to sever at-will employment relationships by reading a
duty of good faith and fair dealing into at-will employment
contracts. See, e.g., Mitford v. de Lasala, 666 P.2d 1000, 1007
(Alaska 1983); Fortune, 364 N.E.2d at 1255-56 (Massachusetts); Hallv. Farmers Ins. Exch., 713 P.2d 1027, 1029-30 (Okla. 1985). 
Indiana courts, however, have taken the position that there is no
general implied duty of good faith and fair dealing in at-will
employment contracts. See Mehling v. Dubois County Farm Bureau
Coop. Ass'n, Inc., 601 N.E.2d 5, 9 (Ind. Ct. App. 1992) (declaring
that "Indiana does not recognize a covenant of good faith and fair
dealing in [the at-will employment] context"); Hamblen v. Danners,
Inc., 478 N.E.2d 926, 929 (Ind. Ct. App. 1985) (same); see also Bob
Nicholson Appliance, Inc. v. Maytag Co., 883 F. Supp. 321, 327
(S.D. Ind. 1994) (observing that "[i]t is well-known that Indiana
does not recognize an implied good faith and fair dealing in
contracts"). The Indiana Supreme Court has declared that, if
contract language is clear, "[i]t is not the province of the courts
to require a party acting pursuant to such a contract to be
'reasonable,' 'fair,' or show 'good faith' cooperation." First
Fed. Sav. Bank v. Key Markets, Inc., 559 N.E.2d 600, 604 (Ind.
1990).
 The primary exception to this rule is that a court may
imply a duty of good faith if it is necessary to "effectuate the
clear intent of the parties." Prudential Ins. Co. of Am. v.
Crouch, 606 F. Supp. 464, 469 (S.D. Ind. 1985) (interpreting
Indiana law); see also Key Markets, 559 N.E.2d at 605; Hamlin v.
Steward, 622 N.E.2d 535, 540-41 (Ind. Ct. App. 1993). In the
present case, however, the language of the SRA is unambiguous. It
sets forth with clarity the conditions precedent to claiming under
the Compensation Upon Termination program. It expressly provides
that the program "shall not restrict the right of DePuy to
terminate the Representative" and that "termination before
Representative and Principal have met the conditions precedent"
will leave no rights under the agreement. In a situation such as
this one, we believe that Key Markets runs contrary to implying a
duty of good faith and fair dealing and that, therefore, Dykes's
state claims must fail.
 Dykes relies upon an Indiana intermediate appellate court
decision to argue that Indiana courts are changing their
traditional view of contract interpretation. See Weiser v. Godby
Bros., Inc., 659 N.E.2d 237 (Ind. Ct. App. 1996). In Weiser, the
court reversed a lower court's grant of summary judgment in favor
of a defendant who told an at-will employee to "[s]ign [a new
contract] or clean out your desk and you will be fired." Id. at
239. A one-judge plurality stated that, "[a]lthough the contract
terms may be wholly unambiguous and, thus, not amenable to a fair
dealing requirement, the formulation of that contract is
susceptible to a good faith/fair dealing analysis." Id. We are
not persuaded.
 First, Weiser applied the fair dealing analysis to the
formation of the contract only; the judge expressly noted that
there is no general fair dealing requirement under state law. 
Since Dykes does not argue that he was coerced into signing the
SRA, Weiser is inapposite. Second, the other two judges on the
panel did not join in the good faith and fair dealing analysis used
by the plurality judge, rendering Weiser of "no precedential value." 
Robinson v. Century Personnel, Inc., 678 N.E.2d 1268, 1270 n.2
(Ind. Ct. App. 1997). Third, another Indiana appellate court has
recently disavowed Weiser, calling its continued viability into 
question. See id. (stating, "[i]n any event, we agree with the
dissent in Weiser").
 We conclude that the applicable Indiana law precludes
Dykes from recovering on his good faith claims. Although we need
not reach the question, we also agree with the district court that
Dykes could likely not recover under Massachusetts law either. 
This is so because Massachusetts allows plaintiffs in Dykes's
position to recover only "reasonably ascertainable future
compensation based upon [] past services." Gram I, 429 N.E.2d at
29. Thus, the compensation that the plaintiff seeks must be
"specifically related to a particular past service." McCone v. New
England Tel. & Tel. Co., 471 N.E.2d 47, 50 (Mass. 1984). In this
case, Dykes was four years away from qualifying for payment under
DePuy's Compensation Upon Termination program. Moreover, he had to
meet a yet-to-be-determined sales quota in his final year. In
these circumstances, it appears that Dykes's claim would be denied
by Massachusetts courts as overly speculative. Cf. Gram v.
Liberty Mut. Ins. Co., 461 N.E.2d 796, 798 (Mass. 1984) ("Gram II")
(denying a plaintiff recovery for lost "career credits," which were
bonus payments "based upon the length of Gram's service as a sales
representative").
 We conclude that the district court properly granted
summary judgment on Dykes's good faith claims, and affirm as to
Counts I, III & VIII.
C. Dykes's Motion for Reconsideration of the Magistrate
 Judge's Discovery Order.
 Dykes also appeals from the magistrate judge's denial of
his request to compel DePuy to release information relating to
whether any sales representatives successfully claimed their
Compensation Upon Termination benefits. Dykes sought this
information to establish that DePuy's stated reasons for his
termination were pretextual. Dykes claims that this information is
"directly related to claims upon which the District Court granted
summary judgment." We cannot agree.
 Even if Dykes were to obtain the requested discovery and
DePuy's asserted reasons for terminating him were pretextual, he
could still not recover. Not being an employee, he is not
protected by federal and state antidiscrimination statutes. And
under applicable state law he may not recover for breach of an
implied duty of good faith and fair dealing. No viable claims
remain. Hence, any possible abuse of discretion in denying
Dykes's motion to compel was harmless.
 Affirmed. Costs to appellee.